STATE of Utah, Plaintiff and Respondent,

v.

Ronald Watson LAFFERTY,
Defendant and Appellant.

No. 20740.

Supreme Court of Utah.

Jan. 11, 1988.

Rehearing Denied Feb. 18, 1988.

Richard B. Johnson and Michael D. Esplin, Provo, for defendant and appellant.

David L. Wilkinson and Sandra L. Sjogren, Salt Lake City, for plaintiff and respondent.

ZIMMERMAN, Justice:

Defendant Ronald Watson Lafferty appeals from two convictions of first degree murder, two convictions of aggravated burglary, and two convictions of conspiracy to commit murder. On the two convictions of first degree murder, the jury imposed the death penalty. On appeal, Lafferty raises numerous claims of error and argues that his convictions and sentences must be reversed. We affirm all convictions and all sentences which are the subject of this appeal.

Ron Lafferty believed that Brenda Lafferty, the wife of his brother Allen, had encouraged and assisted Ron's ex-wife in obtaining a divorce from him. After his divorce, Ron, who had previously been excommunicated from the Mormon church, began claiming that he had received a divine revelation that four individuals, including Brenda and her infant daughter, Erica, were to be "removed." On July 24, 1984, Ron and his brother, Dan Lafferty, made numerous comments to two companions that "the Lord" wanted Brenda and her child to die. On the same day, Ron and Dan forced their way into Brenda's house while Allen was away. Ron beat Brenda, strangled her with a vacuum cord, and slit her throat with a knife. Dan killed fifteen-month-old Erica by slitting her throat. Ron, Dan, and their companions subsequently broke into Chloe Low's house, intending to murder her, but Low was not at home. They also discussed the murder of Richard Stowe, the local Mormon leader who had excommunicated Ron, but abandoned that plan when they passed the turnoff to his residence. Ron and Dan Lafferty were later apprehended and tried separately. Dan, who was tried first, was convicted of capital murder among other charges and received two life sentences. Ron's trial was delayed, in part because of concerns that he might be incompetent to stand trial and in part because of his suicide attempt and violent behavior in jail. When he was tried, Ron was convicted of

murder for the deaths of his sister-in-law and niece and of conspiring to murder Chloe Low and Richard Stowe in addition to other charges. He was sentenced to death. Further facts are set forth below.

On appeal, Lafferty raises a number of issues, including claims that the trial court erred by forcing him to stand trial while incompetent, denying him his right of self-representation, disallowing evidence of his insanity, allowing biased jurors to decide the case, allowing prejudicial remarks by the prosecutor, admitting gruesome photographs, and admitting evidence of his violent behavior in jail while awaiting trial.

The first claim is that Ron Lafferty was not competent to stand trial. Utah law prohibits the trial of a person who is incompetent. Utah Code Ann. § 77–15–1 (1982). On September 27, 1984, the prosecuting attorney filed a petition to determine Ron Lafferty's competence to stand trial. At a hearing held on October 23, 1984, the trial court heard testimony from several witnesses, observed Lafferty's conduct, considered the reports of two experts who had examined Lafferty, and found him competent to proceed.

Within a few days, the Utah County Sheriff filed a petition to redetermine competency because Lafferty had assaulted several people in jail. Lafferty was ordered to the Utah State Hospital for evaluation. During the period between November 5 and November 27, 1984, four court-appointed examiners evaluated Lafferty's condition and unanimously concluded that he did not suffer from a mental disease or defect, that he could comprehend the nature of the proceedings, and that he could assist counsel in his defense. At an in-camera proceeding held on November 30, 1984, the court again found Lafferty competent to proceed.

On December 29, 1984, Lafferty attempted to hang himself, but was resuscitated after being found unconscious and without a heartbeat. Because of the possibility of organic brain damage, the four examiners who had made the second evaluation conducted a third. On January 28, 1985, after hearing the testimony of Lafferty and the examiners, the trial judge found that Lafferty was incompetent to stand trial at that time. The trial judge stated, however, that the evidence showed great improvement in Lafferty's condition since the attempted hanging, improvement that would probably continue until Lafferty would be competent to stand trial. The trial judge ordered continued hospitalization and treatment.

On March 19, 1985, the four examiners released a follow-up report on Lafferty's progress. They stated that the organic problems caused by the suicide attempt had been partially resolved and that Lafferty's personality structure and demeanor had come to approximate his condition prior to the suicide attempt. The examiners found that Lafferty had a factual understanding of both the nature of the proceedings and the potential punishment for the offenses charged. Although the organic problems resulting from the suicide attempt had abated to such an extent that they no longer rendered Lafferty incompetent, the examiners believed that he was suffering from paranoia and was therefore incompetent.[1]

In describing the symptoms of the paranoid disorder, the examiners stated that Lafferty's pervasive religiosity, which had been noted during the November, 1984 evaluation, had since developed into a "reli-

---

1. At a competency hearing held on April 2, 1985, the examiners testified that Lafferty was suffering from two mental illnesses: (i) an amnestic syndrome resulting from the suicide attempt and (ii) paranoia. However, the examiners made it clear that the amnestic syndrome did not render Lafferty incompetent to stand trial. In his testimony at the competency hearing, Dr. Howell stated: "I don't think his amnesia—I don't think his organic problem interferes with his helping [his attorney], I think it's his paranoid problem that interferes with that."

Similarly, during the direct examination of Dr. Groesbeck, the following interchange occurred:

Q Now, if he could put aside this religious belief or this paranoid delusional system, he could in fact cooperate with counsel and could in fact actively participate in the trial process, couldn't he?

A Yes, if the delusional system were put aside, then I think he could, even in spite of the fact that he does have some memory deficits in the organic side of his problem.

gious delusional system," that Lafferty was unable to determine the boundaries between himself and spiritual beings, that he was experiencing "blurred ego boundaries," that he was suffering from a "religious martyr complex," that his mind had created a "paranoid pseudo-community involving the legal and social systems," that one of Lafferty's revelations was "reflective of Messianic grandiosity," that Lafferty felt the hospital and the judicial system were agents of corrupt man-made law and were on trial before God, and that it was "impossible for him to [understand] the inconsistency of his objecting to others infringing on his liberty [while he claimed] an entitlement from God to infringe on the liberty of others."

The trial court held a competency hearing on April 2, 1985. Three of the four examiners who submitted the report testified at the hearing. Lafferty was questioned, and the State called an expert witness who differed with the four examiners in that he found Lafferty competent. On April 8, 1985, the trial court issued a memorandum opinion finding Lafferty competent to stand trial.

On appeal, Lafferty asserts that all of the reliable evidence supported a finding of incompetence and, therefore, that the trial court's contrary finding was factually erroneous. In essence, Lafferty argues that the court arbitrarily rejected the analyses and conclusions of the four court-appointed examiners who had observed him over a long period of time in favor of the opinion of one state expert who had relatively brief exposure to the matter. We reject this claim.

■ In a competency proceeding, a trial court must determine whether an accused has the ability to understand the nature of the proceedings and the potential punishment and has the ability to assist counsel in his or her defense. Utah Code Ann. § 77–15–2 (1982).[2] Such a determination is

ultimately a mixed question of fact and law. *Drope v. Missouri*, 420 U.S. 162, 174–75 n. 10, 95 S.Ct. 896, 905 n. 10, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 385–86, 86 S.Ct. 836, 842, 15 L.Ed. 2d 815 (1966); *White v. Estelle*, 459 U.S. 1118, 1121–23, 1125–26, 103 S.Ct. 757, 758–60, 74 L.Ed.2d 973 (1983) (Marshall, J., dissenting). The legal part of the question is the proper interpretation of the statutory standard. Of course, any such interpretation must adequately protect the due process rights of an accused. *See Drope*, 420 U.S. at 163, 171–72, 174–75, 95 S.Ct. at 899, 903–04, 905; *Pate*, 383 U.S. at 378, 86 S.Ct. at 838; *White*, 459 U.S. at 1121, 103 S.Ct. at 758 (Marshall, J., dissenting).

■ Lafferty expressly challenges the trial court's findings of fact. He does not expressly claim that the trial court violated his right to due process under either the federal or the state constitution by misinterpreting the statute. However, he does make an apparent attack on the trial court's statutory interpretation by pointing out that he did not cooperate fully with his counsel at trial. Therefore, we reach the federal due process issue despite Lafferty's failure to clearly raise it. We do not reach the parallel state constitutional issue because Lafferty has not briefed it. *See infra* note 5.

As we read section 77–15–2, the relevant inquiry is whether Lafferty had the *ability* to assist counsel, not whether he in fact chose to assist counsel or to comply with all of counsel's wishes. This reading of the statute complies with federal due process standards. *See Drope*, 420 U.S. at 172, 95 S.Ct. at 904; *Pate*, 383 U.S. at 388, 390–91 & n. 4, 86 S.Ct. at 843, 844–45 & n. 4 (Harlan, J., dissenting); *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960) (per curiam). The trial court applied the statute as we have interpreted it. It specifically found that

---

**2.** Section 77–15–2 reads:

 For the purposes of this chapter, a person is incompetent to proceed if he is suffering from a mental disease or defect resulting either:

 (1) In his inability to comprehend the nature of the proceedings against him or the

punishment specified for the offense charged; or

 (2) In his inability to assist his counsel in his defense.

Utah Code Ann. § 77–15–2 (1982).

Lafferty had the ability to assist his counsel and that his mental condition was such that his due process rights would not be denied by proceeding to trial. We conclude that Lafferty's due process rights under the federal constitution were not violated by the application of section 77–15–2 as interpreted by the trial court.

Lafferty has directly challenged the trial court's factual findings under the statute. Findings of fact will not be overturned unless clearly erroneous. Utah R.Civ.P. 52(a). The clearly erroneous standard established by Utah Rule of Civil Procedure 52(a) applies to competency proceedings because they are civil rather than criminal in nature. *See Society of Professional Journalists v. Bullock,* 743 P.2d 1166, 1177 n. 13 (Utah 1987). In addition, rule 52(a)'s clearly erroneous standard applies to judicial findings of fact in both civil and criminal proceedings. *State v. Walker,* 743 P.2d 191, 192 (Utah 1987) (citing Utah R.Crim.P. 26(g); Utah R.Civ.P. 81(e)).

Our review of the record reveals the following: (i) the court-appointed examiners failed to explain and to support adequately the conclusory labels they affixed to Lafferty's mental state, thus making the affirmative evidence of incompetency weak; (ii) the examiners' diagnoses were based on the premise that Lafferty's religious beliefs and experiences did not accord with reality, an unsupportable premise on which the trial judge could not rely; and (iii) ample affirmative record evidence supports the trial judge's finding of competency. We therefore conclude that the trial court's rejection of the examiners' opinions and its conclusion that *Lafferty* was competent were not clearly erroneous.

■ The trial court's rejection of the examiners' conclusions is supported by the examiners' failure to explain the change in their opinions that occurred between November, 1984, and March, 1985.[3] For example, in November, Dr. Howell opined that Lafferty was competent, stating:

Because in my opinion, Mr. Lafferty does not have a mental illness, he is therefore competent to proceed at least so far as his mental health is concerned. He may object to having a lawyer defend him, but I believe this decision will not be the result of the thinking of a mentally disordered person.

Similarly, in a joint report dated November 27, 1984, all four experts found that Lafferty's religiosity was not a symptom of paranoia or other mental illness, stating:

We find that Mr. Lafferty is not mentally ill.... Although he clearly has fundamentalist religious beliefs ..., we feel that these do not approach the level of a thought disorder. He specifically does not meet the criteria for "paranoia" or paranoid schizophrenia.

Thus, in November, 1984, the experts did not consider Lafferty's religiosity a symptom of any mental illness.

In March, 1985, however, the doctors claimed that Lafferty's pervasive religiosity had become a "religious delusional system." Yet, the examiners' use of new diagnostic labels—such as "Messianic grandiosity" and "religious martyr complex"—did not necessarily indicate a change in Lafferty's religiosity or mental state since November. For example, Lafferty's reported revelations occurred before the November examination, and he did not purport to have received any revelations after that time. Nevertheless, in March the doctors stated that Lafferty's revelations reflected "Messianic grandiosity," one of the labels used to support their finding of incompetency to assist counsel. It is unclear what had changed since November, other than the labels used to describe Lafferty's condition.

Although the examiners were aware in November of the revelation instructing Ron Lafferty to kill Brenda and Erica Lafferty, they found him to be mentally sound at that time. However, their conclusion in March that he was mentally ill was based in part on his inability to understand the

---

**3.** Although Lafferty did try to hang himself in December, 1984, neither the examiners' reports nor their testimony indicate that the suicide attempt and its consequences were the bases for their changed opinions.

"inconsistency" of objecting to infringements of his freedom while claiming an entitlement from God to infringe on the rights of Brenda and Erica. Citing no change whatsoever in the underlying facts, the examiners simply characterized the revelation differently in March than they had in November.

Between November and March, the examiners also changed the characterization of Ron Lafferty's suspicion of the legal system and his belief that God would defend him in the courtroom. In November, they concluded that his beliefs and suspicions were "the result of preoccupation with religion and not the result of mental illness." Yet, in March, they stated that he was suffering from a "religious martyr complex" and was experiencing a "paranoid pseudo-community involving the legal and social systems." The record does not indicate that these new labels reflect any actual change in Lafferty's condition. The mere recitation of new labels conveyed little of substance about the changes in Lafferty's condition that supposedly led the experts to change their views.

Certainly, expert psychological testimony can be useful in competency proceedings. However, its utility depends on its intelligibility and persuasiveness. In *Carter v. United States*, 252 F.2d 608, 617 (D.C.Cir. 1957), the court stated:

> Unexplained medical labels—schizophrenia, paranoia, psychosis, neurosis, psychopathy—are not enough. Description and explanation of the origin, development and manifestations of the alleged disease are the chief functions of the expert witness. The chief value of an expert's testimony in this field, as in all other fields, rests upon the material from which [the] opinion is fashioned and the reasoning by which he [or she] progresses from [the] material to [the] conclusion; ... it does not lie in [the] mere expression of conclusion.

Similarly, Chief Justice Warren E. Burger, then sitting on the United States Court of Appeals for the District of Columbia Circuit, aptly observed:

The jury wants and needs help from the expert, but it does not help a jury of [laypersons] to be told of a diagnosis limited to the esoteric and swiftly changing vocabulary of psychiatry. Every technical description ought to be "translated" in terms of "what I mean by this," followed by a down-to-earth concrete explanation in terms which convey meaning to [laypersons]. A psychiatrist who gives a jury a diagnosis, for example, of "psycho-neurotic reaction, obsessive compulsive type" and fails to explain fully what this means, would contribute more to society if he [or she] were permitted to stay at his [or her] hospital post taking care of patients.

*Campbell v. United States*, 307 F.2d 597, 614 (D.C.Cir.1962) (Burger, J., dissenting). Chief Justice Burger's reasoning applies with equal force to expert testimony on issues such as competency that are decided by a judge rather than a jury.

A finder of fact, whether judge or jury, is free to reject diagnoses and conclusions that are not adequately explained. Even in the unlikely event that a fact finder understands the full significance of a psychological term such as "paranoid pseudo-community," the mere incantation of the term does not convey much of substance because it fails to describe the analysis and data on which the diagnosis was based. We do not mean to imply that the doctors' diagnoses in this case were necessarily incorrect. We simply hold that in the absence of an adequate explanation, the trial court could properly reject as unpersuasive and unhelpful the conclusory labels the doctors assigned to Lafferty's condition.

The trial court could also reject the examiners' opinions because they were based on unfounded assumptions about Lafferty's religious experiences. The examiners concluded that Lafferty was mentally ill because they assumed that his various religious experiences did not occur, regardless of the purported substance of those experiences.

The examiners' diagnoses illustrate the assumptions underlying their opinions. In reporting that Lafferty's revelations re-

flected "Messianic grandiosity," the doctors necessarily assumed that the revelations were not real, that they never happened. One doctor testified that he was simply unwilling to believe that Lafferty's faith in divine intervention was rational. The doctors also assumed that Lafferty's experiences with spirits did not occur; they stated that his inability to "determine the boundaries between himself and ... spirits" was a symptom of paranoia. Overall, the examiners concluded that Lafferty was living within a "religious delusional system"; in other words, the examiners thought that Lafferty's religious experiences did not comport with reality. In the absence of some foundation for their assumptions that Lafferty's religious experiences did not occur, the trial court was justified in rejecting the psychiatrists' conclusions.

Moreover, the trial court's rejection of the examiners' opinions was in accordance with federal constitutional authority. Just as lack of foundation prevents courts from deciding whether religious experiences actually occur, the religion clauses of the first amendment prohibit courts from determining the validity of religious beliefs.[4] *See e.g., United States v. Ballard,* 322 U.S. 78, 86–87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944); *United States v. Lee,* 455 U.S. 252, 257, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982). In *United States v. Ballard,* the Court stated:

> Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they are beyond the ken

of mortals does not mean that they can be made suspect before the law.

322 U.S. at 86–87, 64 S.Ct. at 866. Similarly, due process considerations bar courts from requiring defendants to prove the truth of their religious beliefs because they would have to prove the unproveable, an obvious unfairness of the most fundamental kind. *See* U.S. Const. amend. XIV; Utah Const. art. I, § 7.

The final reason for upholding the trial judge's determination that Lafferty was competent to stand trial is that the record contains sufficient evidence to support that conclusion. Lafferty contends that no reliable evidence supports a finding of competence, but we disagree. It is true that four experts testified that they considered Lafferty incompetent in the spring of 1985. And it is also true that the State's sole expert had minimal exposure to the facts before he gave his opinion that Lafferty was competent. But merely weighing the number of witnesses is never dispositive. *See Lemon v. Coates,* 735 P.2d 58, 60 (Utah 1987); *Yelderman v. Yelderman,* 669 P.2d 406, 408 (Utah 1983); *Holland v. Brown,* 15 Utah 2d 422, 425–26, 394 P.2d 77, 79 (1964); *United States v. Handy,* 454 F.2d 885, 888 (9th Cir.1972).

The trial court heard and considered all the expert testimony, put it in perspective against the background of the prior hearings, and observed Lafferty before it made the following findings of fact:

> [Lafferty] has the mental capacity to appreciate his presence in relation to time, place and things; his elementary mental processes are such that he knows and understands that he is in a court of justice and is charged with criminal offenses of two counts of criminal homi-

---

4. It might be argued that Lafferty's belief in divine revelations and spirits is so bizarre that it is not within the legitimate protections of the first amendment. *See Thomas v. Review Bd. of the Ind. Employment Sec. Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 1430–31, 67 L.Ed.2d 624 (1981). However, we take judicial notice of the fact that belief in divine revelation and personal spiritual experiences are part of the doctrine of the Mormon religion, of which Lafferty had at one time been a member. *See, e.g., Doctrine and Covenants,* Official Declaration—2 (revelation to Mormon leader Spencer W. Kimball in

1978 extending priesthood to all worthy men, whereas formerly blacks had been excluded); *Doctrine and Covenants* § 89 (revelation to church founder Joseph Smith in 1833 prescribing a healthy lifestyle); *Book of Mormon,* I Nephi 4:10–18 (revelation to Nephi, circa 600 B.C., commanding him to kill Laban); *cf.* Genesis 6:13–22 (God gave Noah instructions for building an ark); Genesis 22:1–2 (God instructed Abraham to slay his son Isaac as a sacrificial burnt offering); I Samuel 15:1–3 (God sent Saul to destroy the Amalekites).

cide, two counts of aggravated burglary, and two counts of conspiracy to commit murder; he knows and understands the penalties prescribed and he knows and understands that he could be given the death penalty although he may not believe it will occur; he understands that there will be a trial, that there will be a judge on the bench, a prosecutor present who will try to convict him of criminal charges; knows and understands that he has a lawyer appointed for him who will undertake to defend him against those charges; he knows he will be expected, if he so chooses, to tell his lawyer the circumstances, to the best of his ability, of the facts surrounding him at the time and place where the law violations are alleged to have occurred; he knows that there will be a jury present to pass upon the evidence adduced as to his guilt or innocence of such charges; ... he has sufficient memory of material events that with the aid of memory reconstruction techniques he can relate these things in his own personal manner if he chooses to do so.

The trial court also found that Lafferty generally acted consistently and rationally within his system of religious beliefs. On the basis of these factual findings, the trial court concluded that Lafferty had both the ability to comprehend the nature of the proceedings against him and the punishment specified for the offense charged and the ability to assist counsel in his defense.

Having reviewed the record evidence under the standard of review applicable to trial court findings of fact, we cannot say that the trial court's findings were clearly erroneous. *See* Utah R.Civ.P. 52(a).

Lafferty's second claim on appeal is that by not allowing him to defend himself, the trial court denied his right to self-representation guaranteed by the sixth amendment to the federal constitution and article I, section 12 of the Utah Constitution, as well as the codification of that right in section 77–32–2 of the Code. However, he does not argue that the analysis of this issue under the Utah Constitution would be different from its analysis under the federal constitution. Therefore, no state constitutional analysis is necessary.[5] Similarly, no statutory analysis is necessary because section 77–32–2 is apparently nothing more than a codification of the constitutional rights to assistance of counsel and self-representation.[6] Moreover, Lafferty does not argue that in enacting section 77–32–2, the

---

5. In several of his claims of error, Lafferty has relied nominally on state constitutional provisions while actually relying on the parallel federal constitutional provisions and analysis based on them. As a general rule, we will not engage in state constitutional analysis unless an argument for different analyses under the state and federal constitutions is briefed. *See State v. Ashe,* 745 P.2d 1255, 1257 n. 2 (Utah 1987); *State v. Earl,* 716 P.2d 803, 805–06 (Utah 1986); *cf. State v. Hygh,* 711 P.2d 264, 271–73 (Utah 1985) (Zimmerman, J., concurring) (arguments for different analyses under the state and federal constitutions should be considered if made). We have said:

> This Court will review errors raised and briefed on appeal in death penalty cases, even though no proper objection was made at trial, but will reverse a conviction based upon such errors only if they meet the manifest and prejudicial error standard. In addition, this Court has the power to notice manifest ("palpable") error apparent in the record and correct a conviction based upon the same if the error is prejudicial, even though such error is not objected to at trial or assigned on appeal.

*State v. Tillman,* — P.2d —, — (Utah 1987) 72 Utah Adv.Rep. 6, 7 (Dec. 22, 1987). As *Till-*

*man* implies, the mere mention of a claim of error unaccompanied by any legal argument is not necessarily enough, even in a death case, to require that we engage in a full-blown analysis of the claim. Unless the error is manifest on the record, not only must it be raised, but an argument must be briefed. This Court will not engage in constructing arguments out of whole cloth on behalf of defendants in capital cases. That is not to suggest, however, that if the issues were properly presented, we might not find some variance between the state and federal rights.

6. Section 77–32–2 provides:

> Counsel shall be assigned to represent each indigent person who is under arrest for or charged with a crime in which there is a substantial probability that the penalty to be imposed is confinement in either jail or prison if:
>
> (1) The defendant requests it; or
>
> (2) The court on its own motion or otherwise so orders and the defendant does not affirmatively waive or reject of record the opportunity to be represented.

Utah Code Ann. § 77–32–2 (Supp.1987).

legislature either intended to or in fact did enlarge the scope of those constitutional rights.

■ Lafferty grounds this claim factually on the trial court's finding that he was competent to stand trial. He contends that because he was competent, the trial court was obligated to honor his request that he be permitted to defend himself. The sixth amendment to the federal constitution guarantees an accused the right to self-representation. *See, e.g., McKaskle v. Wiggins,* 465 U.S. 168, 173–74, 104 S.Ct. 944, 948–49, 79 L.Ed.2d 122 (1984); *Faretta v. California,* 422 U.S. 806, 807, 818, 95 S.Ct. 2525, 2527, 2532, 45 L.Ed.2d 562 (1975). However, it also grants a countervailing right to the assistance of counsel. *See, e.g., Johnson v. Zerbst,* 304 U.S. 458, 462–63, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938). "[A]n accused has a Sixth Amendment right to conduct his [or her] own defense, *provided only that he [or she] knowingly and intelligently forgoes his [or her] right to counsel....*" *McKaskle,* 465 U.S. at 173, 104 S.Ct. at 948 (emphasis added). A mere finding of competence, without more, does not automatically enable an accused to waive the constitutional right to assistance of counsel and to conduct his or her own defense. In order to assert the right of self-representation, an accused must not only be competent, but must also intelligently and knowingly waive the right to assistance of counsel:

> Although petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing or inquiry into the issue of his competence to waive his constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense. "The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused."

*Westbrook v. Arizona,* 384 U.S. 150, 150, 86 S.Ct. 1320, 1320, 16 L.Ed.2d 429 (1966) (quoting *Johnson,* 304 U.S. at 465, 58 S.Ct. at 1023); *see also State v. McCumber,* 622 P.2d 353, 356 (Utah 1980) (fundamental constitutional right to due process may be waived knowingly and voluntarily only).

■ When Lafferty first asserted his right to self-representation, he was allowed to conduct his own defense with the assistance of stand-by counsel, as is permissible under *McKaskle v. Wiggins,* 465 U.S. at 184, 104 S.Ct. at 954. After the suicide attempt, stand-by counsel conducted Lafferty's defense until he regained competence to stand trial. At a hearing on April 24, 1985, the trial judge informed Lafferty of his right to waive counsel and advised him of the court's responsibility to determine whether the waiver was knowing and intelligent. Lafferty's attorney asserted that Lafferty wished to represent himself, but when the trial court attempted to question Lafferty in this regard, Lafferty responded, "No comment." The trial court explained that a waiver of the right to assistance of counsel must be affirmative and that Lafferty would have to answer some questions so that the trial court could determine whether Lafferty's waiver was knowing and intelligent. Lafferty's response to further questioning was again, "No comment." Because Lafferty failed to waive his right to counsel affirmatively and failed to give the trial court any basis for determining that his decision to represent himself was made "knowingly and intelligently," we hold that the trial court did not violate the federal constitution by requiring the defense attorney to continue to represent Lafferty.

■ Lafferty's third claim is that the trial court, after having appointed counsel to defend him, erred in allowing Lafferty to control substantive aspects of his defense. At trial, defense counsel proffered expert testimony concerning Lafferty's mental state at the time of the killings, in an attempt to establish a mental state for manslaughter rather than for first degree murder. Lafferty strongly objected to that approach; he explained to the trial court

that he feared the jury would interpret it as an admission of guilt. The trial court informed Lafferty that an argument in the alternative is not an admission of guilt; that absent a manslaughter defense, the jury would probably be left with a choice between a verdict of not guilty and a verdict of first degree murder; that the jury could impose the death penalty for first degree murder; and that defense counsel felt strongly that this evidence was essential to Lafferty's defense. Both the trial court and defense counsel were careful to assure that Lafferty had a clear understanding of the situation and the consequences of his decision. Lafferty remained firm in his decision, based on the belief that the jury would interpret the introduction of evidence supporting a manslaughter defense as an admission of guilt. Observing that nothing indicated that Lafferty was incompetent, the trial court ordered Lafferty's attorney to comply with his client's wishes. Lafferty argues that the court should not have allowed him to control his defense in this manner. Because he cites no applicable constitutional provisions or case authority, we assume that his claim is based solely on the federal constitutional right to assistance of counsel. *See supra* note 5. We disagree with Lafferty's contentions.

In *State v. Wood*, 648 P.2d 71, 91–92 (Utah), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982), this Court held that the sixth amendment requires an attorney to present a defense of innocence if the client insists, even if it is against the better judgment of the attorney, because "an attorney acts as an assistant for [the] client, and not as a master." 648 P.2d at 91–92 (citing *Faretta v. California*, 422 U.S. at 820, 95 S.Ct. at 2533); *see* U.S. Const. amend. VI. The right to assistance of counsel "implies a right in the defendant to conduct his [or her] own defense, with *assistance* at what, after all, is his [or her], not counsel's[,] trial.... The [accused] must be allowed to control the organization and content of his [or her] own defense...." *McKaskle v. Wiggins*, 465 U.S. at 174, 104 S.Ct. at 949. Clearly, the sixth amendment gives an accused the right to

control the substance of his or her defense. An accused is not bound to follow the recommendations of counsel. This is true despite the fact that "self-representation is almost always likely to be detrimental to a defendant, no matter how intelligent or well-educated." *State v. Wood*, 648 P.2d at 92; *accord McKaskle*, 465 U.S. at 177–78 n. 8, 104 S.Ct. at 950–51 n. 8.

Clearly, the right to control the substance of one's own defense presents the danger that an accused will make decisions that are seriously detrimental to his or her interests. However, given the trial court's duty to protect an accused's right to counsel and to assure that the accused does not waive that right unknowingly or unintelligently, we think that this danger does not warrant a blanket rule that would free a competent accused from the consequences of his or her informed choices. In any event, the need for such a rule is obviated when, as in the present case, the trial court assures that a competent accused makes decisions with a basic understanding of the situation and the potential consequences. We find that the trial court did not abuse its discretion either by allowing Lafferty to rely solely on the defense of innocence or by blocking his attorney's attempts to present a manslaughter defense.

■ Lafferty's fourth claim is that the trial court strictly interpreted section 77–14–4(2) of the Code, violating his due process and equal protection rights under the state and federal constitutions. U.S. Const. amend. XIV; Utah Const. art. I, §§ 7, 24. He does not argue for a separate state constitutional analysis, and we consider only his federal claim. *See supra* note 5.

Section 77–14–4(2) provides that an accused who fails to cooperate fully with court-appointed examiners shall be barred from presenting at trial expert testimony going to the issue of insanity or diminished mental capacity. Utah Code Ann. § 77–14–4(2) (Supp.1987). Lafferty argues that a strict interpretation would allow a statutorily insane defendant to discard the insanity or diminished capacity defense

simply because the defendant's paranoia prevents the required cooperation.

Whatever merit Lafferty's argument may have, *see, e.g., United States v. Byers*, 740 F.2d 1104, 1115 (D.C.Cir.1984), the issue is not presented in this case for two reasons. First, at the competency hearing on April 8, 1985, the trial court determined that Lafferty was not statutorily insane at that time. In a hearing held the next day, the trial court thoroughly explained the consequences of refusing to cooperate with court-appointed examiners. Lafferty said that he understood the consequences but would not cooperate. He made an informed decision at a time when he had been found competent. Therefore, he was not statutorily insane when he decided not to cooperate. Second, the trial court did not exclude expert testimony on the issue of Lafferty's insanity or diminished mental capacity pursuant to section 77–14–4(2). The only reason that such evidence was not introduced in the guilt phase of the trial was Lafferty's adamant refusal to present either the insanity or the manslaughter defense. Lafferty refused to present either of those defenses because he believed that the jury would interpret them as an admission of guilt. Because the statute did not come into play in Lafferty's decision not to present those defenses, he has no stake in the resolution of the statute's proper interpretation. Without a stake in the resolution of this issue, Lafferty lacks standing to assert the claim. *See, e.g., Society of Professional Journalists v. Bullock*, 743 P.2d at 1173, 1174; *Jenkins v. Swan*, 675 P.2d 1145, 1148–49 (Utah 1983).

Lafferty's fifth claim is that in denying his motion for a change of venue based on prejudicial pretrial publicity, the trial court abused its discretion and violated his right to trial "by an impartial jury." Utah Const. art. I, § 12. He contends that pervasive adverse publicity in Utah County caused five of the twelve jurors to decide before trial that he was guilty. Although Lafferty relies nominally on the Utah Constitution and on Utah Rule of Criminal Procedure 29,[7] he does not argue that the state constitutional analysis should be different from the federal; therefore, we treat his claim as one based only on the sixth and fourteenth amendments. *See supra* note 5.

The ultimate test of whether a failure to change venue constitutes an abuse of discretion is whether the defendant was tried by a fair and impartial jury. *See State v. Wood*, 648 P.2d at 88; *State v. Pierre*, 572 P.2d 1338, 1350 (Utah 1977). Evidence of the pervasiveness of the pretrial publicity is not enough to answer the question of whether the jury was fair and impartial. " '[P]re-trial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial.' " *Codianna v. Morris*, 660 P.2d 1101, 1111 (Utah 1983) (quoting *Nebraska Press Association v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976)). Such publicity may lead jurors to form opinions about the defendant's guilt, as happened in this case, but that does not necessarily disqualify the jurors.

To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be

---

**7.** Utah Rule of Criminal Procedure 29(e) provides:

> (e)(i) If the prosecution or a defendant in a criminal action believes that a fair and impartial trial cannot be had in the jurisdiction where the action is pending, either may, by motion, supported by an affidavit setting forth facts, ask to have the trial of the case transferred to another jurisdiction.
>
> (ii) If the court is satisfied that the representations made in the affidavit are true and justify transfer of the case, the court shall enter an order for the removal of the case to the court of another jurisdiction free from the objection and all records pertaining to the case shall be transferred forthwith to the court in the other county. If the court is not satisfied that the representations so made justify transfer of the case, the court shall either enter an order denying the transfer or order a formal hearing in court to resolve the matter and receive further evidence with respect to the alleged prejudice.

Utah R.Crim.P. 29(e). Lafferty does not argue that rule 29 in any way expands the federal constitutional right. Thus, no separate analysis under rule 29 is necessary.

to establish an impossible standard. It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court.

*Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975) (quoting *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961)) (cited with approval in *State v. Pierre,* 572 P.2d at 1349).[8]

It is true that some of the jurors expressed an opinion that Lafferty was guilty; however, after the trial judge had questioned them carefully, each unequivocally stated that he or she would set aside preconceived notions, accord Lafferty a presumption of innocence, and decide the case on the evidence presented at trial. These responses fully satisfy the standards set by *Nebraska Press Association v. Stuart, Murphy v. Florida, Codianna v. Morris, State v. Wood,* and *State v. Pierre.* Finally, the totality of the circumstances does not indicate that the jurors' assurances that they would be impartial were untrustworthy.[9] Therefore, we hold that Lafferty was not denied his right to trial by an impartial jury.

■ This holding also disposes of Lafferty's sixth claim. He contends that the trial court erred in failing to exclude for cause those jurors who had decided that he was guilty. This contention must be rejected under the authorities set forth above because each of those jurors also assured the trial judge that he or she would set aside preconceived notions, follow the law, and accord Lafferty a presumption of innocence.[10]

■ Lafferty's seventh claim is that the trial court erred by failing to question certain jurors concerning their knowledge about his brother, Dan Lafferty, who had previously been tried and convicted for his part in the murders but had not been sentenced to death. Specifically, Ron Lafferty argues that the trial court should have questioned all jurors about their knowledge of Dan's convictions. He contends that the trial court's failure to ask such a question of some of the seated jurors deprived him of the opportunity to exercise his peremptory challenges intelligently and therefore violated his right to be tried by an impartial jury. *State v. Norton,* 675 P.2d 577, 588–89 (Utah 1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984), *overruled on other grounds, State v. Hansen,* 734 P.2d 421 (Utah 1986). We assume that this claim is grounded in the sixth amend-

8. Compare Utah Code Ann. § 77–35–18(e)(14) (1982), which states:

 [N]o person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public journals or common notoriety, if it satisfactorily appears to the court that the juror can and will, notwithstanding such opinion, act impartially and fairly upon the matter....

9. In *Murphy v. Florida,* the Court stated that jurors' assurances that they will be impartial are not necessarily dispositive because (i) it remains open to the defendant to demonstrate during voir dire the actual existence of such a strongly held opinion that a presumption of partiality is raised, and (ii) in some cases, the "general atmosphere in the community or courtroom is sufficiently inflammatory" that "these indicia of impartiality might be disregarded." 421 U.S. at 800, 802, 95 S.Ct. at 2036, 2037. Our review of the record of voir dire reveals that Lafferty failed to show the jurors held strong opinions as to his guilt. Furthermore, Lafferty's motion for a change of venue under Utah Rule of Criminal Procedure 29(e) and the documents supporting the motion failed to show that the community atmosphere was sufficiently inflammatory that the jurors' assurances of impartiality should have been disregarded. *Compare Codianna v. Morris,* 660 P.2d 1101 (Utah 1983); *State v. Wood,* 648 P.2d 71 (Utah 1982); *State v. Pierre,* 572 P.2d 1338 (Utah 1977), *with Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Pamplin v. Mason,* 364 F.2d 1 (5th Cir. 1966); *Maine v. Superior Court of Mendocino County,* 68 Cal.2d 375, 438 P.2d 372, 66 Cal.Rptr. 724 (1968).

10. Lafferty cites Utah Rule of Criminal Procedure 18(e)(13), which allows voir dire challenges for cause to jurors who have formed an opinion as to guilt. However, he does not argue that it expands the federal constitutional right to trial by an impartial jury. Nor does he argue that compliance with rule 18(e)(13) differs in any way from compliance with the federal constitutional right.

ment's guarantee of trial by an impartial jury. U.S. Const. amend. VI.

This claim is without merit. First, in general the trial court followed Ron's proposed line of questioning, including questions about Dan's conviction. Although the court apparently forgot to ask a few members of the jury panel about Dan's convictions, it never refused to ask when defense counsel reminded the court of the omission. Furthermore, throughout the voir dire process the trial court not only allowed Ron to interject his own questions, but also asked regularly if the State or the defense had any additional questions. The record demonstrates that the trial judge would accommodate any request to ask a prospective juror about his or her knowledge of Dan's convictions. Ron cannot claim now that the occasional failure to ask about Dan's convictions denied him his right to trial by an impartial jury.

A second reason for finding that Ron Lafferty's right to an impartial jury was not violated lies in the questions the trial judge did ask. The trial court asked each juror about media exposure to the case and whether he or she had any opinion about Ron's guilt. The purpose of these questions is the same as the purpose of questions about potential jurors' knowledge of Dan's convictions: to determine whether the prospective jurors had preconceived notions about Ron Lafferty's guilt. And only those who answered satisfactorily were seated. Under the facts of this case, we cannot say that Lafferty was deprived of either the ability to exercise his peremptory challenges intelligently or his right to trial by an impartial jury.

Lafferty's eighth claim is that the trial court violated his rights to due process and to trial by an impartial jury under the fourteenth and sixth amendments by excluding potential jurors who were reluctant to impose the death penalty and by failing to exclude prospective jurors who strongly favored imposing the death penalty.[11] In *State v. Norton*, 675 P.2d at 589, this Court explained that the test of a jury's impartiality is whether each juror can follow the court's instructions.

On the issue of capital punishment, the object of voir dire is to obtain a jury that can hear the evidence and apply the law without legal partiality for or against capital punishment. Approval of or opposition to capital punishment in general is not legal partiality for this purpose. . . .

. . . The proper test of legal partiality is whether a juror's views about capital punishment would prevent or substantially impair him or her from conscientiously taking the juror's oath and performing his or her duties as a juror by following the court's instructions on the law of capital punishment and applying them to the facts of the particular case.

 Under this standard, Lafferty's challenge must be rejected. Jurors who generally favored imposing the death penalty should not necessarily have been excluded. Mere approval of the death penalty is not legal partiality. Furthermore, those jurors asserted that they were willing to follow the court's instructions on the law. On the other hand, two jurors who did not know whether they could impose the death penalty under any circumstances were properly excluded.[12] Potential jurors

---

**11.** The State suggests that Lafferty's failure to make the appropriate objections and challenges in the trial court has some bearing on the merit of his claim. The State apparently contends that the trial court did not err because Lafferty did not object. Because the actual existence of error obviously does not depend on proper objections or challenges, we can only assume that the State intended to argue that Lafferty's claim of error could not be raised for the first time on appeal. This argument is without merit. It is well established that on direct appeal in capital cases this Court, will consider all claims of error raised and briefed on appeal, regardless of

any failure to object below. *E.g., State v. Tillman*, 750 P.2d 546; *State v. Norton*, 675 P.2d at 581; *State v. Wood*, 648 P.2d at 77; *State v. Pierre*, 572 P.2d at 1345 & n. 9.

**12.** The trial judge explained to one potential juror the jury's function in a death penalty case, i.e., to balance the mitigating factors against the aggravating factors. The trial judge explained the meaning of the terms "aggravating factor" and "mitigating factor" and asked in at least five different ways whether the potential juror would follow the court's instructions. Her answers indicate either that she would not or that she did not know whether she would:

whose attitudes concerning the death penalty are so strong that they cannot commit to following the court's instructions are properly excluded because their attitudes substantially impair their ability to function as impartial jurors. *Cf. State v. Hewitt,* 689 P.2d 22, 25–26 (Utah 1984) (a potential juror's assurances of impartiality are overcome by record evidence indicating biases so strong and deep as to preclude impartiality); *State v. Moore,* 562 P.2d 629, 630–31 (Utah 1977) (a potential juror who clearly expresses both strong biases and uncertainty about his or her ability to be fair and impartial must be excused for cause).

Lafferty's ninth claim is that the trial court erred in "death-qualifying" the jury. "Death-qualifying" means excluding for cause all jurors who under no circumstances would vote for the death penalty. Lafferty cites *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.1985), as authority for the proposition that death-qualifying results in a jury that is conviction-prone and, therefore, does not represent a fair cross-section of the community as required by the sixth and fourteenth amendments. However, since

Q Okay. Now if you found as a juror, in your mind, after the verdict of guilty, that the aggravating circumstances outweighed the mitigating circumstances, beyond a reasonable doubt; would you vote to impose the death penalty?
A I'd have to sleep on it.

Q You are not sure whether you would or not, right?
A Yes.

Q Okay. Do you feel that you just would not vote to impose the death penalty under any circumstance, that that's too harsh a punishment for any circumstance?
A Well, I'm like Ronald Reagan. Well, like I say, I've never been for the death penalty. But, what is the other alternative?
A Life imprisonment.
A I'd say life in prison.
MR. JOHNSON: Could I ask a question, your Honor?
THE COURT: Yes.

Q (By Mr. Johnson) I'm just wondering, if we asked: If the judge instructed you what the test was for the death penalty, would you follow the law as the judge instructed you?
A Now, say that again.
Q If the judge told you what the test was, he tells the jury what the law was as it related to when the death penalty could be imposed

Lafferty filed his brief in this case, the United States Supreme Court has reaffirmed the constitutionality of death-qualifying juries in capital cases. *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 1766–67, 90 L.Ed.2d 137 (1986). Therefore, Lafferty is not entitled to reversal of his conviction on this ground.

Lafferty's tenth claim is that certain statements made by the prosecutor amounted to prosecutorial misconduct that requires reversal. First, in his opening statement in the guilt phase, the prosecutor told the jury that Ron Lafferty "slashed [Brenda Lafferty's] throat" and that he "stood over her and he grabbed her hair, and he pulled her head back so that the blood from her heart would pump freely to the kitchen floor." Second, also in the opening statement, the prosecutor made the following comment while discussing the evidence supporting the charge of conspiracy to murder Richard Stowe:

The defendant will tell you in his own handwriting, by way of a journal entry: "Richard Stowe is my enemy." Presi-

and when it could not, would you follow his instructions?
A I'm not sure about that.
The trial court asked another potential juror two different questions about his ability to impose the death penalty. His answers indicate that he did not know whether he could do so:
Q ... If I told you that the bad circumstances of this crime had to outweigh the not so bad circumstances of the crime beyond a reasonable doubt, and if you found that those bad circumstances did outweigh the others beyond a reasonabl[e] doubt, would you impose the death penalty?
A It's a hard question to answer. I would have to say that right now I don't know whether I can or not.
Q Okay. If I told you that, or put it another way, if you found in your own mind that the good circumstances, the less offensive circumstances of the crime, outweighed the— strike that. If you found in your own mind that the good outweighed the bad, then I take it you would not impose the death penalty. Right?
A Well, that is right.
Q But, on the other hand, if the bad outweighed the good, you don't know whether you would or whether you wouldn't. Is that right?
A I don't know if I could or not. I'll put it that way.

dent Stowe, having provided that divorce consultation and having presided over the excommunication of the defendant, his name shows up on what has commonly been referred to as the "hit list revelation."

The term "hit list revelation" referred to Ron Lafferty's "revelation" that Brenda Lafferty, Erica Lafferty, Chloe Low, and Richard Stowe should be "removed." The prosecutor referred to Lafferty's "hit list" several times in closing arguments to the jury. Finally, during his closing argument in the penalty phase, the prosecutor stated:

He will kill again. He will murder. He will take another human life. The only thing, Ladies and Gentlemen, and believe me I know exactly what I'm saying to you, because I'm going to shift my burden in a moment, but, the only thing between ... him and his next victim is you. The only thing that's going to save the life of the next victim is you. I can't do it anymore.

Ron contends that the prosecutor's statements about the manner of Brenda's killing and about a hit list were unsupported by any evidence and were unfairly prejudicial. He also argues that it was unfairly prejudicial for the prosecutor to offer his personal opinion about Ron Lafferty's propensity to kill again. Lafferty does not specify the legal basis for this claim, and therefore, we assume that it is based on his federal constitutional rights to due process and to confront witnesses against him. *See supra* note 5; *Gladden v. Frazier*, 388 F.2d 777, 780 (9th Cir.1968), *aff'd sub nom. Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *State v. Williams*, 656 P.2d 450, 452 (Utah 1982); U.S. Const. amends. VI, XIV.

■ The State contends that Lafferty waived these arguments by failing to object at trial and by failing to ask for a curative jury instruction. *See State v. Hales*, 652 P.2d 1290, 1292 (Utah 1982). The State's argument is without merit. In a capital case, this Court will review errors raised on appeal, even if no proper objection was made at trial, but will reverse a conviction based on such errors only if they

are "manifest and prejudicial." *State v. Tillman*, 750 P.2d 546, 553 (Utah 1987); *State v. Norton*, 675 P.2d at 581; *State v. Wood*, 648 P.2d at 77.

■ We first consider the propriety of the opening statement. In *State v. Williams*, 656 P.2d at 452 (citation omitted), this Court stated that a proper opening statement should give the jury an unargumentative overview of the facts the party intends to prove:

The purpose of an opening statement is to apprise the jury of what counsel intends to prove in his [or her] own case in chief by way of providing the jury an overview of, and general familiarity with, the facts the party intends to prove. It is generally accepted that an opening statement should not be argumentative.

We conclude that the prosecutor's reference to the "hit list revelation" in his opening statement, although colloquial, was not improper under *Williams*. The evidence presented at trial did show that the revelation named four persons who should be killed or "removed," and the prosecutor only stated that this revelation had been "commonly referred to as the 'hit list revelation.'" Under such circumstances, the use of the term did not make the opening statement unduly argumentative.

■ In his opening statement, the prosecutor also described the way in which Brenda Lafferty was killed. He stated that Ron Lafferty first slit Brenda's throat and then grabbed her hair and pulled her head back so that her blood would flow freely to the floor. The evidence at trial, however, was that Ron grabbed Brenda's chin, pulled her head back, and then slit her throat, with the result that her blood flowed onto the floor. The discrepancy between the facts proven and the opening statement may seem rather minor, but the difference was certainly calculated to heighten the cold viciousness of the killing. The prosecutor's description of Brenda's death was not in accord with the evidence and was argumentative. However, the discrepancy is arguably so slight that it was not error.

But even assuming that the prosecutor's description was erroneous, error requires reversal only if it is prejudicial. Utah R.Crim.P. 30(a); *State v. Hackford*, 737 P.2d 200, 204 (Utah 1987); *State v. Knight*, 734 P.2d 913, 919 (Utah 1987); *State v. Williams*, 656 P.2d at 452. An error is prejudicial only if we conclude that absent the error, there is a reasonable likelihood of a more favorable outcome for the defendant. *State v. Tillman*, 750 P.2d 546. Unless our confidence in the outcome is undermined by the error, prejudicial error has not been shown. *See Hackford*, 737 P.2d at 205–06; *Knight*, 734 P.2d at 918–20; *Williams*, 656 P.2d at 452–53.[13] A review of the record convinces us that the prosecutor's improper description of this evidence was not prejudicial error. The evidence against Lafferty was overwhelming.

 We turn now to Lafferty's objections to closing argument. In both the guilt and penalty phases, the prosecutor referred to the revelation which listed those to be "removed" as Lafferty's own hit list of people against whom he sought revenge. Those remarks were plainly argumentative. They would not be permissible opening statements under *Williams*. However, the remarks were made during closing argument. The standard for determining the propriety of a closing argument is different from that used to judge an opening statement. A party has considerably more freedom in closing argument. "Counsel for both sides have considerable latitude in their [closing] arguments to the jury; they have a right to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom." *State v. Valdez*, 30 Utah 2d 54, 60, 513 P.2d 422, 426 (1973). The prosecutor's

statements about the revelation were nothing more than his inferences drawn from the evidence. They were proper under *Valdez*.

 In the penalty phase, the prosecutor also argued that Lafferty would kill again if he did not receive the death penalty. Section 76–3–207(2) of the Code states, in pertinent part: "In [capital felony] sentencing proceedings, evidence may be presented as to any matter the court deems relevant to sentence, including ... the defendant's character, background, [and] history...." Utah Code Ann. § 76–3–207(2) (Supp.1987). It is clear from this language that evidence regarding Lafferty's character, including any propensity he might have to commit additional violent acts, would be admissible in the penalty phase. Similarly, argument concerning violent propensities would also be permissible under *Valdez*. Lafferty apparently does not contest the propriety of such argument; he objects to the prosecutor's assertion of personal knowledge when he said, "[Lafferty] will kill again. He will murder. He will take another human life."

We agree with the general proposition that a prosecutor engages in misconduct when he or she asserts personal knowledge of the facts in issue. For example, DR 7–106(C)(3) of the Rules of Professional Conduct of the Utah State Bar provides: "[A] lawyer shall not ... [a]ssert his [or her] personal knowledge of the facts in issue, except when testifying as a witness." *Cf.* Proposed Rules of Professional Conduct Rule 3.4(e), 54A Utah Adv.Rep. 11, 36 (April 6, 1987) (effective January 1, 1988) ("A lawyer shall not ... assert personal knowledge of facts in issue except when

---

**13.** In *Williams*, this Court stated: "Whether an improper [remark in the] opening [statement] constitutes reversible error depends on whether the prosecutor was guilty of bad faith and the prejudicial effect of the statement on defendant's case." 656 P.2d at 452. A different test was used in *State v. Troy*, 688 P.2d 483 (Utah 1984), a case which also involved prosecutorial misconduct during opening statement. In *Troy*, we did not suggest that bad faith need be shown. All that is necessary, according to *Troy*, is that "the remarks call to the attention of the

jurors matters which they would not be justified in considering in determining their verdict" and that the remarks rise to the level of prejudicial error. 688 P.2d at 486. At this time, we need not resolve any conflict that may exist between these articulations of the test for reversible prosecutorial misconduct during an opening statement, because under either test, misconduct is reversible only if it had a prejudicial effect or influence on the jury. *See State v. Tillman*, 750 P.2d 546.

testifying as a witness...."). Similarly, the ABA Standards for Criminal Justice, section 3-5.8 (2d ed. 1980), provides: "Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued."

The prosecutor's statements concerning Lafferty's violent propensities could possibly appear to be assertions of fact. However, they are properly understood as inferences that the prosecutor drew from the evidence. Because they are logically mere predictions of the future, we think it very unlikely that a juror would consider these statements to be factual testimony from the prosecutor—the evil to be guarded against—rather than mere argument for the imposition of the death penalty based on the evidence presented. Therefore, we find no error in the prosecutor's argument, and certainly no manifest and prejudicial error.

Lafferty's eleventh claim is that the trial court erred in admitting certain photographs during the guilt and penalty phases and a videotape during the penalty phase. We will consider the photographs first. The photographs can be separated into two categories. The first consists of pictures of the homicide victims, including (i) a black and white photograph of the corpse of the baby, Erica, in her crib with her throat slit, and (ii) a color photograph of Brenda Lafferty's corpse lying on the kitchen floor in a pool of blood. Lafferty argues that these photographs had little probative value and should have been excluded because of their highly prejudicial and inflammatory impact on the jury.

The governing evidentiary rule is Utah Rule of Evidence 403, which provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

This rule is "substantively comparable" to former Utah Rule of Evidence 45. Utah R. Evid. 403 advisory committee note.

Although the rule's language seems to require a simple balancing of probative value and potential for unfair prejudice, our past decisions have recognized that inherent in certain categories of relevant evidence is an unusually strong propensity to unfairly prejudice, inflame, or mislead a jury. Evidence in these categories is uniquely subject to being used to distort the deliberative process and improperly skew the outcome. Consequently, when evidence falling within such a category is offered, we have required a showing of unusual probative value before it is admissible under rule 403. In the absence of such a showing, the probative value of such evidence is presumed to be "substantially outweighed by the danger of unfair prejudice." The categories of evidence subject to that requirement include a rape victim's past sexual activities with someone other than the accused, *State v. Johns*, 615 P.2d 1260, 1264 (Utah 1980); statistical evidence of matters not susceptible to quantitative analysis, such as veracity of a witness, *State v. Rammel*, 721 P.2d 498, 501 (Utah 1986); and gruesome photographs of a homicide victim's corpse. *E.g., State v. Cloud*, 722 P.2d 750, 752-53 (Utah 1986); *State v. Garcia*, 663 P.2d 60, 64 (Utah 1983).[14]

As we indicated in *Cloud* and *Garcia*, gruesome photographs will often be excluded because the required showing of unusual probativeness cannot be made. This is because there is no legitimate need for the gruesome photographs of a homicide victim's corpse that prosecutors usual-

---

**14.** These are the categories of evidence given somewhat unique treatment under our cases interpreting rule 403. Many other discrete categories of evidence are given analogous treatment, albeit under other rules of evidence. *E.g., Kofford v. Flora*, 744 P.2d 1343, 1361 (Utah 1987) (Zimmerman, J., concurring; Durham, J., concurring in the result) (rule 702—HLA paternity test results); *State v. Fulton*, 742 P.2d 1208, 1212 (Utah 1987) (rule 702—lie detector results); *State v. Saunders*, 699 P.2d 738 (Utah 1985) (rule 404—evidence of prior crimes).

ly seek to introduce. An important consideration in assessing the probative value of a photograph is whether the facts shown by the photograph can be established by other means. In *Garcia*, this Court stated that the introduction of potentially prejudicial photographs of a corpse is generally inappropriate if "the only relevant evidence they convey can be put before the jury readily and accurately by other means not accompanied by the potential prejudice." 663 P.2d at 64; *accord State v. Cloud*, 722 P.2d at 752; *State v. Wells*, 603 P.2d 810, 813 (Utah 1979). Other factors will also come into play in the balancing process. These may include whether the photographs are in color or black and white, when they were taken in relation to the crime, whether they are closeups or enlargements, their degree of gruesomeness, the cumulative nature of the evidence, and whether facts shown are disputed by the defendant. *See, e.g., State v. Cloud*, 722 P.2d at 752–54; *State v. Garcia*, 663 P.2d at 63–64; *State v. Wells*, 603 P.2d at 812–13; *State v. Ross*, 28 Utah 2d 279, 283–84, 501 P.2d 632, 635–36 (1972); *State v. Poe*, 24 Utah 2d 355, 359, 471 P.2d 870, 872 (1970); *State v. Poe*, 21 Utah 2d 113, 117–18, 441 P.2d 512, 514–15 (1968).

█ We have read the trial transcript and have viewed the photographs at issue, and we conclude that the trial court abused its discretion in admitting the photographs into evidence. The photographs were quite gruesome. They are not merely crime-scene photographs, but pictures of bodies, conveying little information beyond the fact that the victims died violent and bloody deaths. The black-and-white photograph of the baby showed the corpse, not as it was found, but repositioned in the crib so that the gaping neck wound and blood-covered face and body could be seen. Next to the baby in the crib were a baby bottle and a toy. The color photograph of Brenda's corpse showed dried blood on the face, arms, back, and legs; a large pool of blood on the kitchen floor; the neck wound; and the bruised and swollen lips. The emotional impact of these photographs was strong, and they had no unusual probative value.

When asked about the probative value of these photographs, the prosecutor explained that they were relevant to several factual issues in the case. However, the relevant information contained in the photographs was limited to the nature of the wounds and the positions of the bodies, matters that could readily have been conveyed to the jury by other means. In fact, the photographs were merely cumulative of the testimony of Allen Lafferty, Ron's brother, who told the jury how he found the bodies of his wife and daughter; of the investigating officers, who also described the condition of the corpses as they were found at the scene of the crime; and of the medical examiner, who testified about the autopsy results. And Ron Lafferty did not contest any of the facts shown by the photographs. On balance, we conclude that the photographs had no unusual probative value that could justify exposing the jury to their strong potential for creating unfair prejudice. Therefore, they should have been excluded under rule 403.

█ Having found the admission of the photographs to be an abuse of discretion, we must determine the harmfulness of the trial court's error. The challenged photographs do approximate in gruesomeness the photographs in *Cloud* and *Poe*, cases in which their admission required reversal. *See State v. Cloud*, 722 P.2d at 752–55; *State v. Poe*, 21 Utah 2d at 117–18, 441 P.2d at 514–15. However, in the present case, the prosecution did not unduly emphasize or otherwise misuse the photographs, as occurred in *Cloud*, 722 P.2d at 754–55. Most importantly, the other evidence against Lafferty was so overwhelming that there is little or no likelihood that the outcome of either the guilt or the penalty phase of the trial was affected by the admission of the photographs. We conclude, therefore, that the error was not prejudicial. *See State v. Knight*, 734 P.2d at 919–20; *State v. Wells*, 603 P.2d at 813.

The second category of photographs that Ron Lafferty challenges consists of a family photograph showing Brenda and Erica standing next to Allen. Ron contends that the photograph was irrelevant to any is-

sues in the case and was unfairly prejudicial. We need not address this issue now, because, as with the other photographs, any error in admitting this photograph was harmless because of the overwhelming evidence of Ron's guilt. However, we will point out that several courts have recognized that the probative value of a photograph showing a homicide victim's appearance before the crime was committed is often weak. *See, e.g., Ritchie v. State*, 632 P.2d 1244, 1246 (Okla.Crim.App.1981); *People v. Ramos*, 30 Cal.3d 553, 577–78, 639 P.2d 908, 921–22, 180 Cal.Rptr. 266, 279–80 (1982), *rev'd on other grounds*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

■ Ron also contends that his sentences must be reversed because the trial court erroneously admitted a videotape of the crime scene into evidence during the penalty phase of the trial. The videotape showed (i) the living room with various items strewn about on the floor and blood splattered on the wall; (ii) the kitchen with the phone receiver dangling by its cord, a pillow on the floor, and Brenda's body on the floor, as it was found; and (iii) Erica's body in the crib, as it was found. The prosecution argued that the videotape was relevant to the balancing of aggravating and mitigating factors because it evidenced the existence of the following statutory aggravating factors:

(b) The homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons are killed.

. . . .

(q) The homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner, any of which must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death.

Utah Code Ann. § 76–5–202(1)(b), (q) (1987). The prosecution argued that the items strewn around the living room and kitchen and the blood on the wall were evidence that prior to Brenda's death, she was seriously injured during a struggle.

This Court has viewed the videotape, and we are of the opinion that its admission was not an abuse of discretion. Overall, the videotape is most properly characterized as a view of the crime scene, with some shots of the corpses. It was not just a grisly view of the bodies. In addition and of equal importance, the videotape was of very poor quality and was mainly black and white, although a few portions were in color. Some parts were intentionally blacked-out. The result was that the jury viewed the crime scene and the bodies for a few minutes at most, and that with some difficulty. The shots of Brenda's body were taken at a distance, and the camera did not linger on the body. Few details of the corpse are visible, and the overall effect is not particularly gruesome or inflammatory. Nor can the black-and-white view of Erica's corpse be considered gruesome. The jurors could only see an infant's body slumped in a crib, facing away from the camera, with no injuries visible. Therefore, the danger of unfair prejudice to Ron Lafferty was minimal, and we cannot say that the trial court abused its discretion in admitting the videotape into evidence.[15]

■ Lafferty's twelfth claim is that the trial court erred by admitting in the penalty phase evidence of other crimes that Lafferty had allegedly committed but of which he had not been convicted. The State was allowed to introduce evidence that Lafferty had assaulted several people in jail while he awaited his trial. Although Lafferty does not specify the legal basis for his claim that admitting this evidence was error, he cites *State v. Bartholomew*, 98 Wash.2d 173, 196–97, 654 P.2d 1170, 1184 (1982),

---

**15.** If the dangers that rule 403 is intended to guard against are minimal or nonexistent, a showing of relevance is generally sufficient to sustain admission of an item of evidence. Therefore, in the present case, the observation that the videotape was cumulative in many respects and that the facts shown in the videotape could have been conveyed to the jury by means of a drawing of the premises with markings showing the location of the bodies, blood stains, and other items is not enough to warrant a ruling that the trial court erred in admitting the tape under rule 403.

*vacated and remanded,* 463 U.S. 1203, 103 S.Ct. 3530, 77 L.Ed.2d 1383 (1983), *aff'd,* 101 Wash.2d 631, 683 P.2d 1079 (1984), for the proposition that evidence of other crimes must be limited to convictions. In *Bartholomew,* the Washington Supreme Court apparently relied on the eighth and fourteenth amendments to the federal constitution. Moreover, Lafferty does not cite any state constitutional provisions. We therefore assume that Lafferty bases his claim only on the eighth and fourteenth amendments. U.S. Const. amends. VIII, XIV.

Utah's death penalty statute provides for a penalty phase in which evidence of any relevant aggravating or mitigating circumstances may be admitted. Utah Code Ann. § 76–3–207(2) (1982 & Supp.1987). This provision complies with the letter and spirit of the federal constitutional requirements for imposition of the death penalty. *See Gregg v. Georgia,* 428 U.S. 153, 203–04, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 303–04, 96 S.Ct. 2978, 2990–91, 49 L.Ed.2d 944 (1976). The only restriction on the admission of such evidence is that it must not be unfairly prejudicial to the accused. *Gregg,* 428 U.S. at 204, 96 S.Ct. at 2939. In *Bartholomew,* the Washington Supreme Court decided that evidence of other crimes for which no convictions had been obtained was unfairly prejudicial. 98 Wash.2d at 196–97, 654 P.2d at 1184.

We decline to adopt the Washington court's holding. We agree that under *Gregg,* the federal constitutional rights of the accused to due process and to be free from cruel and unusual punishment are violated by the admission of unfairly prejudicial evidence in the penalty phase. But we do not believe that federal case law requires that evidence of the accused's violent criminal behavior be limited to prior criminal convictions. We agree with the California Supreme Court, which, in construing a statutory scheme similar to Utah's, *see State v. Tillman,* — P.2d at ——, 72 Utah Adv.Rep. at 33 (Durham, J., concurring and dissenting), concluded that the federal constitutional case law provides no support for such a holding. *See People*

*v. Balderas,* 41 Cal.3d 144, 205–06, 711 P.2d 480, 516, 222 Cal.Rptr. 184, 219–20 (1985); *see also People v. Harris,* 28 Cal.3d 935, 962–63, 623 P.2d 240, 255, 171 Cal. Rptr. 679, 694 (upholding admissibility of evidence of other violent crimes), *cert. denied,* 454 U.S. 882, 102 S.Ct. 365, 70 L.Ed. 2d 192 (1981). A rule prohibiting evidence of violent crimes which have not yet resulted in convictions would preclude the sentencing authority from considering important information about the accused's violent propensities and future dangerousness, factors essential to an evenhanded consideration of death penalty issues. *See Andrews v. Shulsen,* 600 F.Supp. 408, 422–23 (D.Utah 1984) (citing *California v. Ramos,* 463 U.S. 992, 1000–02, 1006, 103 S.Ct. 3446, 3452–54, 3456, 77 L.Ed.2d 1171 (1983); *Jurek v. Texas,* 428 U.S. 262, 274–76, 96 S.Ct. 2950, 2957–58, 49 L.Ed.2d 929 (1976); *Gregg v. Georgia,* 428 U.S. at 203–04, 96 S.Ct. at 2939), *aff'd,* 802 F.2d 1256 (10th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. ——, 98 L.Ed.2d ——, —— U.S.L. W. —— (U.S. Sept. 8, 1987) (No. 87– 5449).

In light of these federal cases, we think it better to adopt a rule that will permit the admission of all evidence essential to a balanced and thorough analysis of the appropriateness of the death penalty, while at the same time assuring the accused's federal constitutional right to be protected from unfair prejudice during the sentencing phase. A defendant's need for this protection is clear. If the State were permitted during the penalty phase to use as evidence in aggravation material that would be insufficiently probative to support a conviction for the other criminal activity, then there is a chance that this material might be used by the sentencing body as the basis for imposing death. Allowing the sentencer to be influenced by material relating to crimes which have not been proven beyond a reasonable doubt would appear to violate the Supreme Court's ruling in *Gregg* that evidence admitted during sentencing must not unfairly prejudice the accused. *Cf.* Utah R.Evid. 404(b) (forbidding the admission of evidence of other crimes except for certain

purposes, and then *only* if the potential for unfair prejudice does not outweigh the probative value). To similar effect are the following cases, which express the law's longstanding hostility to evidence of other crimes because of its potential for unfair prejudice. *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 218–19, 93 L.Ed. 168 (1948); *Boyd v. United States,* 142 U.S. 450, 454–58, 12 S.Ct. 292, 294–95, 35 L.Ed. 1077 (1892); *State v. Johnson,* 748 P.2d 1069, 1074 (Utah 1987); *State v. Long,* 721 P.2d 483, 495 (Utah 1986); *State v. Saunders,* 699 P.2d 738, 741 (Utah 1985) (citing *State v. Forsyth,* 641 P.2d 1172, 1177–79 (Utah 1982) (Stewart, J., concurring)); *State v. Holder,* 694 P.2d 583, 584–85 (Utah 1984); *People of the Territory of Utah v. Coughlin,* 13 Utah 58, 65–66, 44 P. 94, 95–96 (1896). In light of this concern, we hold that the sentencing body—be it judge or jury—may not rely on other violent criminal activity as an aggravating factor supporting a death penalty unless it is first convinced beyond a reasonable doubt that the accused did commit the other crime. *See, e.g., People v. Balderas,* 41 Cal.3d at 205–06, 711 P.2d at 516, 222 Cal. Rptr. at 219–20. This means that the State not only has the burden of persuading the sentencer beyond a reasonable doubt that the totality of the aggravating circumstances outweighs the totality of the mitigating circumstances, as we held in *State v. Wood,* 648 P.2d at 83–84, but also has the burden of proving to the sentencer beyond a reasonable doubt that the defendant actually committed the violent crime which is to be treated as an aggravating factor.

To implement this ruling, we exercise this Court's inherent supervisory power to add two requirements to the penalty phases of capital trials when the prosecution introduces evidence of aggravating factors in the form of other violent crimes which have not resulted in convictions. These requirements shall apply prospectively only. First, in jury cases, the sentencing jury must be instructed (i) as to the elements of the other crime regarding which the evidence was adduced and (ii) that it is not to consider evidence of that crime as an aggravating factor unless it first finds that the prosecution has proven all the elements of the crime beyond a reasonable doubt. Second, to assure that the sentencer's treatment of this aggravating factor can be distinguished on appeal from the treatment of other aggravating circumstances with respect to which no similar preliminary burden of proof rests on the prosecution, the sentencing body must specifically find whether the other crime was proven beyond a reasonable doubt.[16]

Because we have not previously imposed this burden on the State, findings were not made and the jury that sentenced Lafferty to death was not instructed precisely in accordance with our holding today.[17] We assume that the jury relied on the jailhouse violence as an aggravating factor and must therefore determine whether the lack of

---

**16.** Thus, if the sentence is determined by a judge, the judge must make written findings to this effect. *See* Utah R.Civ.P. 52(a); *State v. Walker,* 743 P.2d 191, 192 (Utah 1987) (citing Utah R.Crim.P. 26(g); Utah R.Civ.P. 81(e)) (rule 52(a) applicable to criminal proceedings). A sentencing jury should make such a finding in the form of a special verdict. *See* Utah R.Civ.P. 49; Utah R.Crim.P. 26(g); Utah R.Civ.P. 81(e).

We impose this requirement to assure that on review this Court can adequately assess whether imposition of a death sentence has been improperly based on evidence of other crimes which have not been proven beyond a reasonable doubt. Written findings will facilitate appellate review and reduce the likelihood of reversal. Although we do not reach the constitutional issues, we note that if evidence of other violent crimes was admitted, due process concerns could require the vacating of a death sentence if

we found the evidence insufficient to establish guilt and if the manner in which the verdict was reported did not enable us to be certain that the death sentence would have been imposed without that evidence. *Cf. Zant v. Stephens,* 462 U.S. 862, 880–84, 103 S.Ct. 2733, 2744–46, 77 L.Ed.2d 235 (1983) (interpreting *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) and subsequent cases).

**17.** The trial court did instruct the jury correctly concerning the State's burden of persuasion under *State v. Wood,* 648 P.2d at 83–84. It also told the jury that the State had the burden of proof. Without more, however, we cannot assume that the jury was aware that it could rely on the other crimes as aggravating factors only if it was convinced beyond a reasonable doubt that Lafferty had committed those crimes.

such an instruction violated Lafferty's rights under the federal constitution. A careful review of the penalty phase transcript reveals no such violation of Lafferty's rights. His commission of violent acts at the jail was proven by undisputed eyewitness testimony which we conclude was sufficient to prove his guilt beyond a reasonable doubt. Thus, the State met the burden that we announce today.

■■■■ Lafferty also claims that admitting the evidence of his violence in jail was unfairly prejudicial because he had no prior notice that it would be introduced. Because he does not specify a legal basis for this claim, we assume he relies solely on the fourteenth amendment right to due process, rather than on state constitutional grounds.[18] *See supra* note 5. Any such due process right to notice is protected by Utah Rule of Criminal Procedure 4(e), which provides for the filing of a bill of particulars. Nothing prevents the accused in a capital case from requesting a bill of particulars that sets forth all of the aggravating factors that the State intends to introduce in the penalty phase. *Cf. Andrews v. Morris*, 607 P.2d 816, 822 (Utah) (section 76-5-202 provides notice of statutory aggravating factors), *cert. denied*, 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980). Lafferty made no such request,[19]

**18.** *But cf. State v. Fulton*, 742 P.2d 1208, 1213, 1214 (Utah 1987) (The Utah Constitution contains at least two possible sources of a right to adequate notice of criminal charges: article I, section 7 and article I, section 12.). ·

**19.** Were this not a capital case, the accused's failure to request a bill of particulars would preclude consideration of this claim on appeal. *See State v. Fulton*, 742 P.2d at 1215 (citing Utah R.Crim.P. 12(d); *State v. Miller*, 674 P.2d 130, 131 (Utah 1983); *State v. Wilson*, 642 P.2d 394, 396 (Utah 1982); *State v. Booker*, 709 P.2d 342, 346 (Utah 1985)). However, it is well established that in capital cases, this Court will consider claims raised on appeal even if no proper objection was made at trial. *See, e.g., State v. Tillman*, 750 P.2d 546, *State v. Norton*, 675 P.2d at 581; *State v. Wood*, 648 P.2d at 77.

**20.** Lafferty has recently filed *pro se* a document that he designates a petition for habeas corpus. Because his case is before this Court on direct appeal, we choose to treat his petition as a supplementary brief on his appeal. All but one of the claims raised in the petition were raised

and we cannot say that the trial court's failure to direct the filing of a bill of particulars on its own motion constituted manifest and prejudicial error. *See, e.g., State v. Tillman*, 750 P.2d 546, 553; *State v. Norton*, 675 P.2d at 581; *State v. Wood*, 648 P.2d at 77. Moreover, because Lafferty did not dispute that he committed the acts of violence in the jail, it is hard to see how he could have been prejudiced by a lack of notice. Finally, a review of the record demonstrates that the State established the existence of two other statutory aggravating factors, *see* Utah Code Ann. §§ 76-3-207(2), 76-5-202(1)(b) (more than one homicide committed during a single criminal episode), (q) (an especially heinous, atrocious, cruel, or exceptionally depraved murder, as demonstrated by physical torture or serious bodily injury) (Supp.1987), which were sufficient together to outweight the mitigating factors beyond a reasonable doubt. Thus, any error was harmless. *See State v. Hackford*, 737 P.2d at 204-05 & n. 3.

We have considered every one of Lafferty's other claims and find each of them to be without merit.[20] For the foregoing reasons, all convictions and sentences are affirmed.

HALL, C.J., concurs.

by counsel on direct appeal and are disposed of by this opinion. The sole new claim is that Lafferty's constitutional rights were violated because the competency proceedings were closed. This claim is without merit. We have previously determined that Lafferty sought exclusion of the press and public. *Society of Professional Journalists v. Bullock*, 743 P.2d 1166, 1179 (Utah 1987). In addition, we have directed the trial court to reconsider its order sealing both the transcripts of the proceeding and the memorandum decision finding Lafferty competent to stand trial. *Id.* at 1168, 1179. We also required that Lafferty be given the opportunity to be present or represented at the reconsideration hearing. *Id.* at 1168, 1179-80. Lafferty recently submitted to the trial court an affidavit which stated that he had no objection to the court's releasing the transcripts of his competency hearings. Thus, Lafferty has had the opportunity to seek public disclosure of all the evidence presented at the competency proceedings, as well as the memorandum explaining the trial court's final determination of competency.

HOWE, Justice (concurring):

I concur, except I desire to withhold my concurrence from any implication that defendant's belief that he had received divine revelation to kill four people could not be relied upon by the examiners as a basis for their opinions as to his mental state. While I agree generally that religious beliefs and experiences may not be assumed to be unreal or inquired into by the courts, as stated in the majority opinion, it is unnecessary to the disposition of this case to rely on that rule when considering a religious belief as to divine direction to kill.

DURHAM, J., concurs in the concurring opinion of HOWE, J.

STEWART, Associate Chief Justice (concurring in the result on the conviction and dissenting as to the penalty):

Although I concur in the convictions of the defendant, I do not concur in the majority opinion. Among other points of disagreement with that opinion, I disagree that the trial court's rejection of the examiners' opinions as to Lafferty's competence was in any way required by, or in accord with, the Constitution, as the majority opinion suggests, because "the religion clauses of the First Amendment prohibit courts from determining the validity of religious beliefs." Nor do I believe that the examiners reached their conclusions because they "assumed that Lafferty's religious experiences did not occur."

The trial court did not err, however, in holding that the defendant could assist counsel in the defense of the case. He clearly knew what the charges against him were, the possible penalties, and that defense counsel would be available to represent him. Although the defendant's memory of the events surrounding the homicide may have been less sharp after the suicide attempt, his memory of those events still existed in a degree sufficient to allow him to assist counsel.

Nevertheless, prejudicial error was committed in the penalty phase of the trial, in my view, and therefore the sentence of death should be reversed and the case remanded for another penalty hearing to determine the appropriate penalty.

In closing argument during the penalty phase of the case, the prosecutor contended:

He will kill again. He will murder. He will take another human life. The only thing, Ladies and Gentlemen, and believe me, I know exactly what I'm saying to you, ... the only thing between him and his next victim is you. The only thing that is going to save the life of the next victim of his is you.

This argument was improper because it was plainly wrong; the argument that the defendant would kill again unless the jury returned a verdict of death assumes that the Board of Pardons would not do its job properly in deciding whether Lafferty could ever be paroled—an assumption that has no basis in fact.

In a capital case, the only alternative to a death sentence is a life sentence. Whether an inmate may ever be paroled from such a sentence depends upon the decision of the Utah Board of Pardons, and its decision would necessarily be based in part upon an assessment of the likelihood that an inmate will not be likely to commit an act of violence if paroled. The prosecutor simply put the matter to the jury as a false alternative: either return a verdict of death or the defendant will kill again. The prosecutor could not possibly know whether the defendant would ever be paroled if he were given a life sentence, and it was just plainly wrong for him to have invoked fear and misstatement of both fact and law to the end of moving the jury to impose a death penalty.

The United States Supreme Court in *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) declared, "It is of vital importance to the defendant and the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." This Court has also emphasized that the prosecutor must use "scrupulous care" in a capital homicide case. *State v. Brown*, 607 P.2d 261, 271 (Utah 1980). In *State v. Wood*, 648 P.2d 71 (Utah 1981), we held that a jury could

impose the death penalty only if it was convinced beyond a reasonable doubt that aggravating circumstances outweighed mitigating circumstances and the death penalty was appropriate, taking all factors into account. In the context of the decision the jurors had to make, the point of the prosecutor's remarks could hardly have been more prejudicial.

Furthermore, I find the majority's ruling with respect to the admission of unconvicted crime evidence in the penalty phase unpersuasive. The majority's position that evidence of other unconvicted crimes may be proved in the penalty phase of a capital case is inherently prejudicial.

The rule limiting the admissibility of prior convictions in the guilt phase of a criminal case generally rests upon two foundations which are applicable to the penalty phase of a capital case. First, the courts have been unwilling to become engaged in the trial of collateral charges of crime, with all the attendant waste of time and diversion of resources that is entailed by making a systematic inquiry into the issues presented. Second, the evidence of other crimes is itself highly prejudicial and will undoubtedly taint a jury's deliberations with respect to the appropriate penalty even if the jury does not find beyond a reasonable doubt that the alleged crime was committed and even though an instruction is given not to consider the evidence of the other crime. Beyond that, the jury must make the determination of whether the defendant committed some uncharged crime, with the evidence of the homicide for which they just convicted still in the forefront of their minds. The procedure practically ensures prejudice in the consideration of evidence of other crimes and in the ultimate decision.

The problems inherent in the procedure adopted by the majority are discussed in *State v. McCormick*, 272 Ind. 272, 397 N.E. 2d 276 (1979). In that case, the defendant had been charged with capital homicide and the prosecution sought to introduce evidence at the penalty phase of another, unrelated homicide for which the defendant had not been convicted. In holding unconstitutional the portion of the statute which allowed such evidence, the court stated:

The procedure to be utilized in this case as provided for by statute and case law will be, in fact, two trials. The defendant will first be tried to a jury for the killing of Douglass Overby. If he is convicted, a sentencing hearing will take place. At this sentencing hearing, the defendant will, in essence, be tried for the murder of Harold Lewis. This hearing will be before the same jury which will have just recently convicted the defendant of another, unrelated murder. The trial court noted that if McCormick were tried in an actual criminal trial for the murder of Harold Lewis, any evidence relating to the Overby killing would be inadmissible in the State's case in chief. Likewise, no evidence of the Lewis killing may be admitted in this case in the trial of Count I, the Overby killing. Thus, the effect of the statutory procedure in the present case is obvious: defendant McCormick would be fully tried on two separate, unrelated charges before the same jury. He would be tried on the second count to a jury which has been undeniably prejudiced by having convicted him of an unrelated murder.

272 Ind. at 278, 397 N.E.2d at 280. The court further stated:

[T]he actual evidence of the [second] crime will be presented for the first time to the sentencing jury. The facts regarding this alleged aggravating crime will never have been presented to an impartial, untainted jury, and the risk that the previously tainted jury will react in an arbitrary manner is infinitely greater.

272 Ind. at 279–80, 397 N.E.2d at 281. The same risk is present in the system proposed by the majority even though it requires proof of the other crime beyond a reasonable doubt. *Accord State v. Bartholomew*, 101 Wash.2d 631, 683 P.2d 1079 (1984).

I believe the better course is to completely exclude evidence of crimes for which there is no conviction.