IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2017


**STATE OF TENNESSEE v. JACOB SCOTT HUGHES**


**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-43     Mark J. Fishburn, Judge**

_____

**No. M2016-01222-CCA-R3-CD**
_____


The Defendant, Jacob Scott Hughes, was convicted of first degree felony murder and aggravated child abuse, for which he was sentenced, respectively, to life and twenty-five years, to be served consecutively, as a result of the death of the sixteen-month-old daughter of his girlfriend. On appeal, he raises three issues: (1) the trial court erred in ruling that he could not refer to his co-defendant, who was the mother of the child, as his "co-defendant," as well as to the fact that she had entered a guilty plea to lesser-included offenses; (2) the trial court erred in not redacting from his Facebook message a racial slur, which previously had been ruled inadmissible; and (3) whether autopsy photographs were properly admitted as exhibits during the testimony of the medical examiner. Following our review, we conclude that the issues raised on appeal are without merit and affirm the judgments of the trial court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**


ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., joined.

Grover Christopher Collins, Nashville, Tennessee, for the appellant, Jacob Scott Hughes.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Janice Norman, Alyssa C. Hennig, and Thomas Thurman, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

Although the Defendant, on appeal, does not contest the sufficiency of the evidence to support his convictions, we will set out a condensed version of the trial testimony, which we have determined to be sufficient to support the convictions.

Ashley Judkins testified that she was an assistant manager at the Sonic Drive-In, where the victim's mother, Neena Costanza, worked. Ms. Judkins said that, around 11:30 a.m. on July 8, 2012, she telephoned Ms. Costanza because she had not yet arrived for work. Later, Ms. Costanza arrived and clocked in at 11:52 a.m., in a car driven by the Defendant, with the victim sitting in her car seat. Ms. Judkins spoke with the victim "for just a minute," and the victim was "happy and dancing" to a song on the car radio. There were no visible injuries to the victim at that time. When the Defendant backed out of the parking lot, he screeched his tires and sped off. Ms. Costanza "was upset, [and] definitely wasn't herself that day."

Ms. Judkins said that at 3:00 p.m., Ms. Costanza, who was "frantic and upset," was driven to her apartment by Thomas Whitehead, the manager of the drive-in. When Mr. Whitehead returned to the drive-in, he and Ms. Judkins went to the hospital where the victim had been transported. Ms. Judkins described the Defendant's demeanor at the hospital: "He didn't seem like [the victim's condition] was bothering him at all, and he was more concerned about his own well-being since he had been in the hospital the day before, and when we were outside, he seemed totally fine, just smoking a cigarette, walking around normal." The Defendant told Ms. Judkins that because the victim had "black tarry stools," he had put her in the bathtub to clean her, and when he returned from getting some bleach, the victim had fallen between the bathtub and toilet.

Thomas Whitehead, the current manager of a Sonic Drive-In in Ocala, Florida, testified that he previously had been the general manager of the drive-in on Old Hickory Boulevard in Nashville. On July 8, 2012, he was working at the Nashville drive-in when Ms. Costanza told him that her baby was not breathing. He told her to call 911 and drove her to her residence. Inside the residence, he saw the naked victim, who had a "big bruise" on her left cheek, lying in the bathtub. The victim was "gargling, sounded like she was trying to breathe, but she couldn't." Additionally, the victim had "reddish discoloring in her vaginal area." Ms. Costanza asked the Defendant about the bruise on the victim's cheek, and he replied that she "fell." Mr. Whitehead said that the Defendant was "[r]ude [and] disrespectful" to Ms. Costanza. He did not see the Defendant perform CPR on the victim or give her rescue breaths. Later, at the hospital, the Defendant was "[s]tand off-ish."

David Caruthers testified that he was a firefighter/paramedic with the Nashville Fire Department and on July 8, 2012, responded to a "child not breathing" call at the victim's apartment. When he entered the apartment, he saw the victim lying on the floor on a towel or blanket. He said that the victim was "lifeless. There was no motion, no movement, no crying, the baby's hair was wet, extremely cold to the touch." He discovered that the victim was still breathing and "[s]cooped her up, immediately went to the ambulance where [he] had plenty of room and all of [his] equipment that [he] could work with her." He noticed that she had bruising above her eye, as well as to her chest and lower abdomen.

Carl Standley, an engineer/paramedic with the Nashville Fire Department, testified that he also responded to the call at the victim's apartment. He said that the victim had bruises on her cheek and under her left eye, a dilated left pupil, and a possible bite mark on her left thigh. Later, at the hospital, the Defendant told Mr. Standley that he put the victim in the bathtub after she had vomited and "pooped brown stuff." He left her alone while he went to get something to clean her up and found her as she was when the paramedics arrived.

Edward Greer testified that he was a captain paramedic with the Nashville Fire Department and responded to the call at the victim's apartment. He said that the victim's mother came into the apartment behind him and was yelling, "What happened to my baby?" and the male who was present responded, "[J]ust shut up." Captain Greer said that he had never before seen a child with "that many different injuries" and that she had "more injuries than you would normally see on" a fall from a bathtub. He telephoned the Metro Nashville Police Department ("MNPD") to report the matter because the victim's injuries were not consistent with the explanation as to how they occurred.

Dr. Deborah Lowen, the Director of the Center for Child Protection and Well-Being at the Vanderbilt University School of Medicine, testified that the Center investigates suspected cases of child abuse and neglect. After the unresponsive victim was brought to the hospital, Dr. Lowen talked with the Defendant to get her medical history. She said that as the staff was trying to save the victim's life, the Defendant "was very focused on himself" and "his ability to perform resuscitation moves on the child." Also, he "focused a lot on the Army owing him back pay on his own multitude of medical problems, talked about them repeatedly." Dr. Lowen said that she remembered the Defendant because the "[t]hings he was saying, the way he said them were so not matching at all the child's condition and the circumstances that we were under."

Dr. Lowen's examination of the victim revealed a broken bone to the right side of her skull, a subdural hematoma, and swelling of her brain. Tests performed on the victim

showed "significant brain injury, throughout the brain, all parts of the brain" and swelling to the back of her eyes. The victim had "massive amounts of bilateral retinal hemorrhages, bleeding in the very back of her eyes, both sides, with areas of retinal detachment," and multiple bruises. Based upon the injuries, Dr. Lowen concluded that the victim "had been a victim of child physical abuse and abusive head trauma," which was "nonaccidental." As to whether all of the victim's injuries could have been caused by her falling from a bathtub, Dr. Lowen responded, "[A]bsolutely not." She said that while a fall from a bathtub could result in a skull fracture, it "would not explain all the different sites of impact on [the victim's] head or the subdural or the retinal hemorrhage and retinoschisis and the bruises everywhere." Dr. Lowen said that the victim would have been "symptomatic immediately after suffering" the head trauma and would not have been able to sing or appear happy. Further, none of the victim's injuries could have resulted from CPR, as the Defendant claimed to have performed on her, and any delay in obtaining medical care lessened her chance for survival.

Dr. Adele Lewis testified that she was a forensic pathologist, the Tennessee Interim State Chief Medical Examiner, and the Deputy Chief Medical Examiner for Metro Nashville Davidson County. She said that she performed the autopsy on the sixteen-month-old victim who weighed about twenty pounds at the time of her death, which was the result of multiple blunt force injuries. Dr. Lewis detailed the injuries sustained by the victim:

> She had many, many bruises and scrapes of her head and of her face. She had bleeding underneath her scalp, as well as underneath her skull and on her brain. She had bleeding all around her spinal cord. She had injuries to her brain itself, her brain was very swollen and soft. She had a skull fracture and a broken bone in her skull. She had some bleeding in the back of her neck right where your neck kind of attaches to your head. . . . She also had multiple bruises of her chest, abdomen, back and buttocks and genitalia and also multiple bruises to her arms and legs. She had a bite mark on her left lower leg.

Dr. Lewis explained why there was "no question" that the victim had been beaten to death:

> [T]here's definitely evidence that she was beaten, with the bruising that we see on the outside of the body, you don't get a big bruise on your face from being shaken. You don't get a bite mark on your leg being shaken. So those are specific injuries that tell me that there definitely was some kind of impact or her body striking an object or an object striking her body.

-4-

Dr. Lewis further testified that there were five or six separate impacts to the victim's head, which could not have resulted from a fall.

Detective Sarah Bruner of the MNPD Youth Services Division testified that she interviewed the Defendant at the hospital on July 8, 2012, during which the Defendant said that he had taken photographs on his Blackberry phone of the victim's dark-colored bowel movement and that he had used a laptop computer to send Facebook messages to Ms. Costanza that day. After a search warrant was issued, the Defendant's phone and a laptop were collected from Ms. Costanza's apartment. Detective Bruner subsequently obtained a printed copy of the Facebook messages exchanged between the Defendant and Ms. Costanza.

Detective Chad Gish of the MNPD, accepted by the trial court as an expert in computer and mobile device forensic analysis, testified that Detective Bruner contacted him on July 9, 2012, regarding the Facebook messages. After Ms. Costanza gave Detective Gish her identification and password, he logged in to her live Facebook account and obtained messages exchanged on July 8, 2012, between her and the Defendant, as well as messages between the Defendant and a friend of his, Mark Denton. Detective Gish verified that the printed copy of the Facebook messages were the same messages as those on the live account and took screenshot photographs of the messages, which were admitted into evidence. The Defendant sent Mr. Denton a message at 12:33 p.m., saying, "I'm headed over to the Hammer Skin hangout house here in a few, if you want to come with," and another message at 12:52 p.m., saying, "You bring the smoke, I got some percs 7.5 too." Between 1:13 p.m. and 2:37 p.m., the Defendant sent several messages to Ms. Costanza, including: "I'm majorly over pissed. I hate you. I hate this house. I hate everything. I just wanna be done with it all. Life included. F*** this bulls***. . . . I need to take [the victim] to the hospital possibly. I'm really worried about her. . . . Her sh** is black as hell and she's got washed the first time cuz she threw up twice and now she's fallen and has a swollen cheek bone and f*** it I'm coming there with her and you and I can figure if she needs to go to the hospital or not. . . . I need you home now. I'm freakin out. She's not breathing right." Detective Gish also examined seven photographs taken on the Defendant's Blackberry phone between 1:44 and 1:55 p.m. on the day of the incident. The photographs depicted a large bruise on the victim's cheek, vomit, dark black feces on the victim's body, and heavily soiled diapers.

## ANALYSIS

Although the sufficiency of the evidence has not been raised as an issue on appeal, we have reviewed the evidence and conclude that it is sufficient to sustain the

Defendant's convictions. Now, we will review the issues raised on appeal by the Defendant.

## I. References to Severed Co-Defendant

The Defendant argues that the trial court abused its discretion by not allowing him to refer to Neena Costanza, the victim's mother, as "the co-defendant." She was indicted, along with the Defendant, in certain counts of the indictment but was allowed to plead guilty to lesser-included offenses.

This issue developed from the trial court's ruling that Ms. Costanza was to be referred to by her name, and not as the "co-defendant." Further, the court explained that, while the Defendant could refer to the victim's mother as the "true culprit," she could not be identified as the co-defendant.

Questions concerning the admissibility of evidence rest within the sound discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion. See State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citations omitted). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

In State v. Powers, 101 S.W.3d 383, 395 (Tenn. 2003), our supreme court explained the decision to be made by the trial court regarding Tennessee Rule of Evidence 403 regarding the probative versus prejudicial effect of certain evidence:

> Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Generally, when we review a claim that calls into question a trial court's exclusion of evidence on the grounds of irrelevance, we will not disturb the decision of the trial court absent an abuse of discretion. See State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978).

In our view, the trial court acted within its discretion in limiting the evidence by allowing the Defendant to argue that the victim's mother was the "true culprit" but prohibiting, as irrelevant, the fact that she pled guilty to lesser-included offenses.

This assignment is without merit.

## II. Admission of Racial Slur from Defendant's Facebook Message

Prior to the trial in this matter, the Defendant's then attorney filed a motion pursuant to Tennessee Rule of Evidence 404(b), asking that the court not allow evidence of the Defendant's affiliation, if any, "with the Hammerskins, any other gang or racial organization, or any affiliation with members of such groups." This motion was granted by the court on August 14, 2015. On September 29, 2015, during the trial, the State advised the court that, following a discussion with defense counsel, the one Facebook message of the Defendant containing a racial slur would not be put into evidence. The following day, while the lead prosecutor was not in the courtroom, the Defendant's Facebook reference to "Hammer Skin" came into evidence. During a jury-out hearing, defense counsel moved to redact the reference, which the trial court denied, explaining that the reference might be about a "guy named Hammer Skin, that's his nickname or whatever. I think it's totally innocuous and [the State is] allowed to include it in there." From our review of the transcript, it appears that, although the lead prosecutor had agreed to remove this particular Facebook reference, the prosecutor who was objecting to the removal was unaware of the apparently earlier concession by the State. The Defendant argues on appeal that the "Hammerskins" are a "violent and [the] best-organized neo-Nazi skinhead group in the United States." While this may be true, the State correctly notes that there is no evidence regarding this designation. Further, as the trial court observed in denying the Defendant's motion to exclude this message, it is not clear from the message that the reference is not to a person named "Hammer Skin." Even if we accept as true the defense's characterization in its motion in limine that the message refers to a "gang or racial organization," the proof against the Defendant is so overwhelming that any error in admitting this evidence is harmless beyond a reasonable doubt.

## III. Autopsy Photographs

The Defendant argues that the trial court erred in allowing into evidence fourteen photographs taken during the victim's autopsy and, more specifically, the photograph of the victim's vaginal area after the medical examiner had cut into it. The State responds that these photographs were admissible because the Defendant's explanation that the victim's injuries were the result of a fall from the bathtub contradicted the testimony of the physicians, opining as expert witnesses that the injuries could not have been caused by such a fall.

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks,

564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

"Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and probative value is not outweighed by their prejudicial effect." State v. Brock, 327 S.W.3d 645, 694 (Tenn. Crim. App. 2009). Autopsy photographs are not admissible "solely to inflame the jury and prejudice them against the defendant." Banks, 564 S.W.2d at 951. The photographs must be relevant to prove some part of the State's case. Id. "Photographs of a corpse are admissible in murder prosecutions if they are relevant to issues at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." State v. Derek Williamson, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011), perm. app. denied (Tenn. Dec. 14, 2011). The trial court possesses the sound discretion to determine the admissibility of photographs and will not be overturned on appeal absent a clear showing of an abuse of discretion. Banks, 564 S.W.2d at 949.

In determining the admissibility of photographs of a deceased victim, our supreme court has held:

> This Court has outlined factors to be considered in determining the admissibility of photographic evidence of a victim in a murder case: "The matters to be taken into consideration include the value of photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions." 564 S.W.2d at 951; see also State v. Lafferty, 749 P.2d 1239, 1257 (Utah 1988) ("[F]actors [that] come into play in the balancing process . . . may include whether the photographs are in color or black and white, when they were taken in relation to the crime, whether they are closeups or enlargements, their degree of gruesomeness, the cumulative nature of the evidence, and whether facts shown are disputed by the defendant.").

Our Court of Criminal Appeals has recently analyzed whether the trial court erred by admitting into evidence photographs of deceased victims in a case of vehicular homicide by intoxication. In State v. Harper, No. E2014-01077-CCA-R3-CD, 2015 WL 6736747 (Tenn. Crim. App. Nov. 3, 2015), the intermediate appellate court first viewed the crime scene and autopsy photographs of the victims and found that they were clearly "graphic and gruesome." Id. at *15. In light of this finding, it methodically analyzed whether the photographs' "probative value was substantially outweighed by the danger of unfair prejudice." Id. It looked at the charges against the defendant and the issues at trial to which the photographs may have been relevant, such as whether the defendant was driving so recklessly that it created a substantial risk of death, and whether he knew or reasonably should have known that death resulted from the accident. Id. In doing so, it examined in some detail the issues which the defendant either stipulated or did not dispute. Id. As to the remaining issues at trial, the Harper court found that the photographs had only "minimal probative value." Id. at *16. Against that, it weighed the "inflammatory nature of the graphic photographs" and held that the trial court had abused its discretion in admitting the photographs into evidence.

State v. Willis, 496 S.W.3d 653, 726-27 (Tenn. 2016).

We have examined these photographs, which we will describe. The color photographs generally show the victim's head, both sides of her face, chest, arms, legs, back, and vaginal area, and several of the photographs have had portions cut off for redaction purposes. The victim's body has numerous bruises scattered throughout. Two of the photographs were taken after a portion of the victim's hair had been cut away and show several large red marks on her scalp, as well as a large bruise. One of the photographs is a close-up of the victim's front teeth, as her upper lip was pulled back. Three of the photographs show the victim's skull with the skin pulled back and her brain. Another photograph is of the victim's vaginal area after the medical examiner had cut into it to demonstrate that the injury in that area was actually a bruise, not some type of skin discoloration.

Before deciding which photographs would be admitted into evidence through Dr. Lewis, the trial court first conducted a lengthy hearing. The State advised the court that it was asking for admission of the photographs which showed injuries that could not be seen by the naked eye. The trial court concluded that the photographs "with the bruising with all the sutures" would not be admitted. The photographs showing the victim's head wound, apparently after some of her hair had been shorn away, would be admitted

-9-

because they showed additional wounds which had not been visible before. Two photographs in which the victim's face and scalp had been pulled down would not be admitted. Another photograph, in which the victim's scalp had been pulled back to show the fracture to her skull, was admissible to show this injury. The photograph of the victim's brain was admissible to show the "massive" hemorrhaging. The photograph of the victim's vaginal area was admitted, after it was cropped on each side, to illustrate the deep tissue bleeding, which was the result of bruising. Further, the trial court allowed other photographs to be admitted after they had been cropped to remove inflammatory portions.

During the trial, Dr. Lewis testified as to the significance of each photograph. A photograph of the left side of the victim's face showed a very large bruise on her cheek. Other photographs showed bruises on her forehead, jawline, left arm, chest, and left knee; an adult bite mark on her left leg; a white scar consistent with a cigarette burn on her leg; small, oval bruises on her back consistent with a baby being "forcefully grabbed around the belly or the chest, and those are bruises actually from the fingerprints" pressing into the child's back; an injury on the inside of the victim's mouth; the victim's vaginal area after Dr. Lewis had cut into it to show that the discoloration was actually a bruise; deep bruising underneath her scalp; and a skull fracture. The victim had thirty-five external injuries and five to six areas of bleeding in her head.

In this matter, the defense claimed that the injuries to the victim resulted from her falling from a bathtub onto the floor. Dr. Lewis testified as to the extent of the victim's injuries to various areas on her body and used the photographs to illustrate her opinion that the extensive injuries could not have been the result of a fall from a bathtub. The trial court carefully evaluated each photograph individually before ruling on its admissibility. The trial court weighed the probative value of the photographs against any prejudice to the Defendant and concluded that certain of them were admissible, while others were too inflammatory. It is clear that the trial court did not abuse its discretion in this regard.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE